**REX OIL, LTD., and Empire Petroleum International, Inc., Plaintiffs–Appellees, Cross–Appellants,**

v.

**M/V JACINTH, etc., et al., Defendants,**

**Transoil (Jersey) Ltd. and Transoil U.S.A., Inc., Defendants–Appellants, Cross–Appellees.**

No. 88–2455.

United States Court of Appeals, Fifth Circuit.

May 19, 1989.

Thomas B. Greene, III, Houston, Tex., for defendants-appellants, cross-appellees.

L. Burke Lewis, Amy J. Cassedy, Los Angeles, Cal., for plaintiffs-appellees, cross-appellants.

Before GARZA, JOLLY, and JONES, Circuit Judges:

GARZA, Circuit Judge:

This case was originally tried before Judge Sterling of the United States District Court for the Southern District of Texas on April 8 and 10, 1987. Ten months later, before entrance of final judgment, Judge Sterling passed away. On February 4, 1988, pursuant to Fed.R.Civ.P. 63, Judge Singleton entered judgment against appellant Transoil in the amount of $702,400, plus pre-judgment and post-judgment interest.

The parties raise four issues on appeal: (1) Whether the district court had subject matter jurisdiction of this dispute; (2) Whether Judge Singleton properly entered final judgment following the death of Judge Sterling; (3) Whether Judge Sterling entered findings of fact and conclusions of law sufficient for Judge Singleton to enter judgment in favor of appellees; and (4) Whether the trial court properly calculated damages.

We conclude that the district court had subject matter jurisdiction of this case and that Judge Singleton properly entered final judgment. We are convinced, however,

that the court incorrectly calculated appellee's damages and we remand for proper determination of that issue.

## Background

This dispute involves a "back-to-back" contract wherein Atlantic Richfield Company ("ARCO") agreed to sell a certain petroleum product to Empire Petroleum ("Rex/Empire") (appellees Rex Oil and Empire Petroleum entered into a joint venture specifically for the performance of this transaction) which, in turn, would sell the product to Transoil, Ltd. ("Transoil"). The product was a fluid chemical called "luwa," a distillate blend used to enhance the quality of certain oil products.

Eighty thousand barrels of the luwa was delivered by ARCO to Paktank storage tanks located in Houston. Transoil was obligated to nominate an ocean-going vessel to lift all 80,000 barrels at Houston. Ownership of the product was to pass from Rex/Empire to Transoil at the storage tank flange. Transoil secured payment by causing the Banque de Paris et des Pays–Bas ("Banque Paribas") to issue a letter of credit in favor of Rex/Empire upon the endorsement of supporting warehouse receipts.

On December 2, 1985, Transoil nominated the M/V JALINGA to load the product at the Paktank terminal. Rex/Empire, however, was having difficulty making arrangements with its supplier, ARCO, and the product was never released to Rex/Empire. Consequently, the M/V JALINGA sat idle in the Houston area for six days and was finally dispatched without the 80,000 barrels of luwa. This first encounter with Rex/Empire made Transoil skeptical of the seller's ability to deliver. Nevertheless, the price of the product was right and, after further negotiations, the parties agreed to give it another try.

On January 6, 1986, Transoil nominated another ship, the M/V JACINTH, to transport the product. This vessel, however, was incapable of lifting more than 59,000 barrels. It was thus unable to transport the entire product in a single "lift," as required by the terms of the contract be-

tween Rex/Empire and Transoil. Nevertheless, 59,000 barrels of luwa were erroneously loaded onto the M/V JACINTH. When Rex/Empire requested that the cargo be unloaded, Transoil refused.

On January 9, 1986, Rex/Empire obtained a Rule D, Supplemental Maritime Rules Writ of Attachment of the M/V JACINTH, thereby effecting an arrest and seizure of the 59,000 barrels of luwa. The next day, January 10, 1986, the parties held an emergency hearing before Judge Sterling. There Rex/Empire and Transoil reached an agreement providing for the release of the M/V JACINTH and the sale/transportation of another 80,000 barrels of luwa. The product on board the M/V JACINTH was to be sold to a third party, Chesham Petroleum Company. The agreement further provided that: "If Transoil does not nominate a vessel to lift the cargo by January 31, 1986, plaintiffs may present negotiable warehouse receipts and obtain full payment for the said 80,000 bbls. under the above described letter of credit." Judge Sterling signed the agreement and the parties continued on their way.

On Friday, January 24, 1986, at approximately 7:00 pm E.S.T., Transoil nominated the M/V SLETHAV to lift the luwa cargo in Houston. The ship presented "notice of readiness" to be loaded on Saturday, January 25, 1986. Rex/Empire claimed at trial that it had received no notice of the arrival of the M/V SLETHAV until Monday, January 27, 1986, at approximately 9:45 am, C.S.T. Appellee also asserts that the nomination violated Transoil's own nominating procedures as well as the procedures set out in the agreement of January 10, 1986.

Transoil argued before Judge Sterling that the nomination of the M/V SLETHAV was properly effected and that Rex/Empire accepted the nomination but failed to deliver the cargo. Due to the previous default by Rex/Empire and because of the expenses incurred in holding the M/V SLETHAV over the week-end, Transoil released the ship, without the luwa, at noon on Monday, January 27, 1986. When Transoil failed to nominate

another vessel by January 31, 1986, Rex/Empire presented negotiable warehouse receipts endorsed to Banque Paribas for full payment for the 80,000 barrels of luwa. At the direction of Transoil, Paribas refused to pay Rex/Empire upon the presentment of the instruments.[1] Transoil, of course, argues that it nominated a vessel capable of lifting the cargo before January 31, 1986, as prescribed by the terms of the agreement of January 10th.

Rex/Empire subsequently sued Transoil in the United States District Court for the Southern District of Texas asserting maritime jurisdiction.[2] Judge Sterling presided at trial on April 8 and 10, 1986. He held a final hearing on June 18, 1986 to elicit further arguments from counsel and to issue oral findings and conclusions.

At the hearing, Judge Sterling determined that the court had subject matter jurisdiction of the lawsuit. He explained that, regardless of what had taken place prior to January 10, 1986, on that date the parties reached an agreement "the object of which was to return the JACINTH to commerce. It is my conviction that that agreement was a maritime contract." Pursuant to that maritime contract, Rex/Empire was permitted to draw against a letter of credit on the basis of warehouse receipts in the event that Transoil failed to lift the cargo by January 31, 1986.

Judge Sterling gave a fairly extensive oral exposition of his perceptions about the case. He concluded that Transoil had breached the agreement of January 10, 1986. He stated his intention to enter final judgment in favor of Rex/Empire. During the hearing, he related his basic reasoning for entering such a judgment. He also indicated that he planned "to file detailed findings and conclusions." Approximately eight months later, before filing such findings and conclusions, Judge Sterling passed away.

Discussion

*Subject Matter Jurisdiction.*

Transoil argues that the district court lacked subject matter jurisdiction to hear this case. It urges that this dispute is about nothing more than a land-based agreement for the sale and purchase of a petroleum product. That the transportation of the product was to be effected by ocean-going vessel did not bring the case within the court's admiralty jurisdiction. And since the original contract was not maritime in nature, according to Transoil, it was improper for the court to issue a Rule D Writ of Attachment. Notwithstanding that the January 10, 1986 agreement involved the dissolution of the writ, Transoil argues that the agreement should not permit the appellees to "bootstrap" the creation of admiralty jurisdiction when it never existed in the first place.

Transoil cites *Hunt v. A Cargo of Petroleum Prod. Laden on the Steam Tanker Hilda*, 378 F.Supp. 701 (E.D.Pa.1974), *aff'd*, 515 F.2d 506 (3d Cir.1975), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), wherein the District Court for the Eastern District of Pennsylvania held that admiralty jurisdiction does not encompass a suit to try title to, or the right to possession of, cargo on an ocean-going vessel when the claim to the cargo is not based upon the breach of a maritime contract or the commission of a maritime tort. In that case, plaintiff Nelson Bunker Hunt obtained a writ of attachment and sought possession of a cargo of petroleum laden on a steamship moored in the Port of Philadelphia. Plaintiff Hunt claimed that the oil had its source in an oil field belonging to the Hunt brothers which had been unlawfully seized when the Libyan government nationalized its oil industry. The court concluded that "questions concerning title to or possession of cargo not based on a maritime contract or tort do not bear a significant relationship to maritime commerce."

1. At the time this case was brought, Rex/Empire also had a suit pending in a Swiss court against Banque Paribas involving the right to payment under the letter of credit. The warehouse receipts representing title to the luwa are under sequestration in Switzerland.

2. Complete diversity among the parties is not extant.

The *Hunt* case is inapposite. There was no agreement in that case, as there was here, to release the S.T. Hilda into commerce. Rather, the merits of the propriety of the Rule D seizure was tried to, and determined by, the court. The case at bar has sailed into our court, as it were, in a very different posture.

It may well be that the district court here improperly issued the Rule D Writ of Attachment back on January 9, 1986. That question, however, is not before us because instead of litigating that issue, as the defendants did in the *Hunt* case, Transoil entered into a settlement agreement on January 10, 1986, the effect of which was to release a sea-going vessel into commerce. Thus the question before us here is not whether the writ was properly issued but whether the settlement agreement was a maritime contract that cured any jurisdictional defect that might have rendered that issuance improper.

The parties to the agreement obviously operated under the assumption that the M/V JACINTH could not leave Houston until the Writ of Attachment had been dissolved. Hence, Judge Sterling, who directly witnessed the negotiations between the parties, plainly found as a fact—making allowances for the fact that the record in this case is informal, as discussed below—that the purpose of the agreement was to "release the vessel by these mutual promises." He was in the best position to know the purpose of the agreement, and we cannot say that his finding was clearly erroneous. On the basis of that finding, Judge Sterling concluded as a matter of law that the agreement of January 10 was a maritime contract. In Judge Sterling's words: "I'm saying the deal cut here on the night of January 10th is a maritime contract because it was for a release of the vessel. It's just the same as a bond, but there was an agreement and a stipulation for release and that is maritime."

■ Admiralty jurisdiction exists over any dispute involving maritime contract. *Best v. Honeywell, Inc.*, 491 F.Supp. 269, 271 (D.Conn.1980), *aff'd mem.*, 679 F.2d 872, 874 (2d Cir.1981). To invoke admiralty jurisdiction, the contract must be wholly maritime in nature and relate to trade and commerce upon navigable waters. *R. Maloblocki & Associates, Inc. v. Metropolitan Sanitary Dist. of Greater Chicago*, 369 F.2d 483, 484 (7th Cir.1966). A contract that consists of maritime and nonmaritime elements will be considered "wholly" maritime, so that the district court can exercise admiralty jurisdiction over disputes involving contract, where nonmaritime elements of the contract are incidental to the maritime elements, or where nonmaritime elements are inseparable from maritime elements. *Puerto Rico Maritime Shipping Authority v. Luallipam, Inc.*, 631 F.Supp. 1472, 1474 (D.Puerto Rico 1986). Because Judge Sterling found that the purpose of the agreement was the return of the JACINTH to commerce, we conclude that nonmaritime elements of the agreement were incidental. Furthermore, because the release of the ship was part of the consideration Rex/Empire gave Transoil, the provisions for the subsequent purchase and sale of Iuwa were so intertwined with and dependent upon the release of the vessel as to be inseparable from it. Thus, we hold that Judge Sterling was correct to conclude that the whole contract was maritime in nature and that therefore the district court had maritime jurisdiction over ensuing disputes.

■ In conclusion, regardless of whether the Writ of Attachment was properly issued, the district court obtained jurisdiction of this case as a result of the January 10th maritime contract and retained it thereafter to determine whether Transoil had breached that contract. Given the fact that the district court had jurisdiction of the contract dispute, we must agree with Judge Sterling's decision on the merits. There was testimony at trial by the Managing Director of Empire Petroleum and others to the effect that the nomination of the M/V JACINTH improperly amended the letter of credit and violated the agreement of January 10th. Judge Sterling found that evidence credible. We conclude that the evidence adduced at trial supports the

finding that Transoil breached its agreement with Rex/Empire.

### The Propriety of Judge Singleton's Final Judgment.

■ Transoil urges that Fed.R.C.P. 63 [3] mandates a new trial because Judge Sterling did not file findings of fact and conclusions of law prior to Judge Singleton's decision to enter final judgment. Appellant argues that the "negative inference" of Rule 63 precludes a successor judge from entering final judgment when the predecessor judge has failed, by reason of death, sickness or other disability, to file findings of fact and conclusions of law. Since Judge Sterling never filed such findings, according to Transoil, it was improper for Judge Singleton to enter final judgment.

Rule 63 leaves entirely to the discretion of the successor judge the decision to perform the duties left unfinished by the predecessor or, in the alternative, to order a new trial. We agree with appellant, however, that this grant of authority arises, by the terms of Rule 63, only "after a final verdict is returned or findings of fact and conclusions of law are filed." The propriety of Judge Singleton's entrance of final judgment, thus, turns upon whether Judge Sterling's pronouncements at the hearing on June 18, 1986 constituted findings of fact and conclusions of law.

### The Sufficiency of Judge Sterling's Oral Pronouncements as Findings of Fact and Conclusions of Law.

Transoil characterizes the court's declarations on June 18, 1987, as a "sketchy pronouncement of Judge Sterling's feelings about the case." Rex/Empire calls them "extensive findings of fact and conclusions of law." They cannot be both. A fair assessment of them would reflect something between these two extremes.

Fed.R.Civ.P. 52(a) [4] provides guidance to our decision in this case in two ways. First, the rule states that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Second, the rule provides that "[i]t will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence." We know nothing more, from the terms of Rule 52(a) itself, about whether the court's findings must be "extensive," or whether a "sketchy pronouncement" will suffice.

In *United States v. Forness*, 125 F.2d 928 (2d Cir.1942), *cert. denied*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942), the Second Circuit concluded that the trial court need only make brief, definite, pertinent findings and conclusions on the con-

**3.** Fed.R.C.P. 63 provides:

If by reason of death, sickness or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that because such other judge cannot perform those duties because such other judge did not preside at the trial or for any other reason, such other judge may in such other judge's discretion grant a new trial.

**4.** Fed.R.C.P. 52(a) states:

(a) In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule

58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).

tested matters. That court found no necessity for over-elaboration of detail or particularization of facts. We likewise find no such necessity.

The crucial aspects of this case involved the characterization of the agreement of January 10th as a maritime contract and the determination that Transoil breached it. Upon these points, Judge Sterling stated his reasoning with sufficient force and particularity for this court to understand them, to review them and to find that they were not clearly erroneous. Rule 52(a) does not require more. *See Curtis v. Commissioner of Internal Revenue Service,* 623 F.2d 1047, 1051 (5th Cir.1980) (findings must be sufficiently detailed to give appellate court clear understanding of analytical process by which ultimate findings were reached and to assure that care was taken in ascertaining facts).

Appellants place dispositive force in Judge Sterling's stated intentions to file more detailed findings of fact and conclusions of law. From the recognition that the trial court wished to write a "detailed" opinion, it does not follow that the findings and conclusions stated orally and recorded in open court were insufficient for the purposes of Rule 52(a). For all we know now, Judge Sterling may have intended to file a lengthy admiralty tome to dispose of this case; but, clearly, the absence of such a tome does not operate to necessitate a new trial. Recognition of what Judge Sterling intended to do does not vitiate what he actually did. His oral findings of fact and conclusions of law were adequate to satisfy Rule 52(a).

*Damages.*

■ We are convinced that the district court incorrectly calculated plaintiff's damages. The contract between Rex/Empire and Transoil called for the sale of 80,000 barrels of luwa at a price of $15.50 per barrel, or a total contract price of $1,240,000. The cost to Rex/Empire was the purchase price it was to pay to ARCO for the luwa: $6.72 per barrel, or a total of $537,600. The trial court awarded Rex/Empire its lost profit: $702,400, representing the total contract price minus the purchase price Rex/Empire was to pay to ARCO.

There was argument before Judge Sterling on June 18, 1986 to the effect that title to the luwa was tied up in the Swiss courts pending a resolution of this case and a disposition of the funds sequestered by the court in Switzerland. It appears that Rex/Empire does not presently have a claim of ownership to the product because title is represented by negotiable warehouse receipts that have been endorsed to Banque Paribas. It further appears that Rex/Empire continues to be obligated to pay ARCO the purchase price of $537,600 for the luwa.

This Court is unclear about the relationship between the proceedings in Switzerland and the resolution of the case before us. There is nothing in the record to indicate that the district court ever determined precisely what has happened to the luwa. It is clear, however, that the determination of who holds title to the product will affect the measure of plaintiff's damages. It appears from the present posture of the case that an award of $702,400 does not place Rex/Empire in the position the company occupied before Transoil's breach; rather, it seems to leave appellee $537,600 short.

We therefore remand to the district court for proper determination of damages. Such resolution should include an inquiry into the impact, if any, of the proceedings in the Swiss court upon the title to the luwa; the result of that inquiry may, in turn, affect the amount of appellee's damages. In addition, a dispute exists over charges owing to Paktank for storage of the luwa. The court should resolve this dispute and consider these storage charges in its calculation of damages.

### Conclusion

For the reasons stated above, we AFFIRM the decision of the district court as it relates to jurisdiction and liability. We VACATE the court's damage award and REMAND for further consideration of that issue, consistent with this opinion.