**Irving GELB, Plaintiff,**

v.

**BOARD OF ELECTIONS IN the CITY OF NEW YORK, et al., Defendants.**

No. 94 Civ. 0013 (SS).

United States District Court, S.D. of New York.

March 24, 1995.

511

Irving A. Gelb, New York City, pro se.

Paul A. Crotty, Corp. Counsel of City of New York, New York City (Muriel Goode–Trufant, Diane Saunders, of counsel), for defendants.

**Opinion and Order**

SOTOMAYOR, District Judge.

*Pro se* plaintiff Irving A. Gelb ("Gelb") brings this action alleging that his First, Fourth, and Fourteenth Amendments rights were violated during the 1993 primary and general elections held in Bronx County. Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, ask that I abstain from deciding this matter on the basis of the *Pullman* abstention doctrine. For the rea-

sons discussed below, the motion to dismiss is granted in part, and denied in part. Defendants' request for abstention is also denied.

**Background**

In June 1993, Gelb launched a campaign to be nominated by the Democratic Party for the office of Bronx Borough President. To be placed on the primary ballot, Gelb submitted a designating petition as required by New York Election Law (hereinafter "NYEL") § 6–118. The incumbent successfully challenged Gelb's designating petition, and as a result, Gelb's name was removed from the primary ballot. Final Amended Complaint, dated March 18, 1994 (hereinafter "Final Compl.") at II ¶ 2. Gelb continued his campaign to win the Democratic nomination by running as a write-in candidate. After the primary, Gelb also ran in the general election as a write-in candidate. *Id.*

Gelb's Final Amended Complaint alleges that numerous ballot and voting booth irregularities occurred during the primary and general elections. To help focus this motion, I will detail Gelb's claims by breaking them down into distinct causes of action.

***First Cause of Action—Primary Election: Sample Ballots***

Gelb's first cause of action asserts that the sample ballots utilized in the primary election violated NYEL § 7–118. Section 7–118 requires the board of elections to "provide facsimile and sample ballots which ... shall contain suitable illustrated directions for voting on the voting machine." According to Gelb, the "[w]rite-in column, although an intrinsic part of the voting machine, appears nowhere in the diagram and is not referred to in the instructions on the sample ballots of either the Primary or General Election." *Id.* at II ¶ 5.

***Second Cause of Action—Primary Election: Absentee Ballots***

In his second cause of action, Gelb maintains that the absentee ballots utilized in the primary election violated NYEL § 7–122 in two distinct ways. Section 7–122 provides, in relevant part:

1. (a) Ballots for absentee voters shall be, as nearly as practicable, in the same form as those to be voted in the district on election day, if any, except that ballots for primary elections shall omit the party position of ward, town, city or county committee and except further that such ballots need not have a stub, and shall have the words 'Absentee Ballot,' endorsed thereon. (b) The names of candidates upon the ballot shall be printed in appropriate sections, with titles of offices, section numbers, emblems, voting squares, names of parties and political organizations and blank spaces for writing in names of persons not printed on the ballot ...

(d) On the front of the ballot, shall be printed in heavy black type the following instructions ...

3. To vote for a person whose name is not printed on this ballot write his name in the blank space at the bottom of the column under which the title of the office appears.

N.Y.Elec.Law § 7–122 (McKinney's 1995 Supp.).

Gelb alleges that the absentee ballot used in the primary election lacked the instruction required by § 7–122(d)(3). Final Amended Complaint at II, ¶ 8. He further alleges that the primary absentee ballot lacked blank spaces for write-in candidates as required by § 7–122(b). *Id.* at ¶¶ 7–8.

### Third Cause of Action—Primary Election: Voting Booth Ballots

Gelb also maintains that ballots in the voting booths during the primary election were not in accordance with NYEL requirements. *Id.* at II ¶ 4. Specifically, Gelb states that his rights were violated by defendants' failure to comply with NYEL § 7–114(2)(g), which provides, in relevant part, that "spaces containing names of candidates and for writing in names, and intervening spaces on the paper ballot, shall be separated by light horizontal lines." N.Y.Elec.Law § 7–114(2)(g) (McKinney's 1978). I read this section of Gelb's Final Amended Complaint to mean that the primary ballot lacked spaces for write-in votes, contrary to NYEL § 7–114(2)(g).

Gelb, presumably in the alternative, makes an additional allegation that the form of the voting booth ballot used during the primary election violated § 7–122(1)(a). He states:

§ 7–122, paragraph 1(a) states that 'ballots for absentee voters shall be, as nearly as practicable, in the same form as those to be voted in the district on election day.' From this it can be concluded that since the Office of Bronx Borough President is listed at the top of column # 2 on the Primary Absentee Ballot (submitted as evidence), it also appeared at the top of column # 2 in the voting machines in that district as well as every other district of the Bronx. Such being the case, it was impossible to cast a Write–In vote for the office of Borough President. The column of 40 Write–In slots is to the left of column # 1 in every voting machine. The top of column # 2, therefore, could not have the requisite corresponding Write–In slot. All the contested offices should have been in the first column on the ballot.

Final Compl. at II, ¶ 6. In other words, if the primary voting booth ballot was substantially similar to the primary absentee ballot, it would have been impossible to write-in a candidate for any office listed in the second column of the voting booth ballot because the write-in spaces only corresponded to the offices listed in the first column of the ballot.

### Fourth Cause of Action—Primary Election: Voting Secrecy

Gelb further claims that voting secrecy laws were violated when defendants failed to place pencils in the voting booths during the primary election as required by NYEL § 7–202. *Id.* at II ¶ 10. Section 7–202(1) provides, in pertinent part:

A voting machine to be approved by the state board of elections must ... permit a voter to vote for any person for any office, whether or not nominated as a candidate by any party or independent body without the ballot, or any part thereof, being removed from the machine at any time. The machine must permit voting in absolute secrecy.

N.Y.Elec.Law § 7–202(1) (McKinney's 1995 Supp.). To better understand Gelb's fourth

cause of action, I take judicial notice of NYEL § 8–102(1), which provides in relevant part:

1. The inspectors of election shall ... (g) [s]ee that the voting booths are supplied with pencils having black lead only.

N.Y.Elec.Law § 8–102(1)(g) (McKinney's 1978).

*Fifth Cause of Action—General Election: Sample Ballots*

Gelb's fifth cause of action alleges the same NYEL violation set forth in his first cause of action, the only difference being that the former concerns primary election sample ballots while the latter is based upon the sample ballots used in the general election. Final Compl. at II ¶ 5.

*Sixth Cause of Action—General Election: Display Cards*

Gelb also complains that the display cards used in voting booths during the general election provided instructions on how to vote for candidates from established political parties, but did not instruct voters about the proper write-in procedure [1]. *Id.* at II, ¶ 9. In contrast, the display cards enclosed with the general election absentee ballots included instructions regarding voting procedures for designated and write-in candidates. *Id.* As a result, Gelb believes that the voting machines instructions were "incomplete and therefore discriminatory. They are [were] restricted to only informing the voter on how to vote for a designated candidate, completely ignoring the category of undesignated candidate to be voted for by Write–In. The voter is entitled to know the full extent of his rights and options upon entering the voting booth." *Id.*

*Seventh Cause of Action—General Election: Voting Secrecy*

Gelb's seventh cause of action maintains that the voting secrecy violation set forth in his fourth cause of action also occurred during the general election. *Id.* at II ¶ 10.

*Eighth Cause of Action*

Gelb asserts that the conduct described in causes of action one through seven indicates that the Commissioners of the Board of Elections (the "Commissioners") violated their duties under NYEL, and consequently are guilty of numerous criminal felonies. *Id.* at II ¶¶ 11–12.

*Constitutional Violations and Relief Sought*

It is important to note that Gelb is not challenging the constitutionality of any provision of the NYEL. Rather, Gelb alleges that defendants violated the law as set forth in the NYEL in order to undermine write-in candidacies. Gelb states that the foregoing "errors and omissions ... denied both me and other registered voters our basic rights under the First, Fourth and Fourteenth Amendment of the U.S. Constitution are too glaring to be inadvertant [sic.]." *Id.* at I. He further alleges that "[t]he conduct of the primary election was in clear violation of the First Amendment rights of the citizens in New York to both the freedom of speech and the right to petition Government for a redress of grievances via the electoral process." *Id.* at III, ¶ 3. Moreover, he claims that his Equal Protection rights "were violated by the Board of Elections through its omissions and in its administration of the election. My chances of having won the election as a Write-in should not enter into the question. The election was not administered in a fair and impartial manner." *Id.* at III, ¶ 2.

Gelb seeks $10,000,000.00 in compensatory and punitive damages from the Board of Elections (the "Board"). *Id.* at IV, ¶ 1. He also asks $100,000.00 in compensatory and punitive damages from each of the following Commissioners: George M. Spanakos ("Spanakos"), Seymour Sheldon ("Sheldon"), Weyman A. Carey ("Carey"), Vincent J. Cuttita ("Cuttita"), Douglas A. Kellner ("Kellner"), Paul Mejias ("Mejias"), Gertrude Strohm ("Strohm"), Vincent J. Velella ("Velella"), and Kathleen M. Wagner ("Wagner"). *Id.* at IV ¶ 2. Gelb further prays for an order "admonishing and removing" defendants Spana-

---

1. It is unclear from Gelb's papers what the difference is between sample ballots and display cards.

kos, Carey, Cuttita, Kellner, and Ferdinand C. Marchi ("Marchi") from their positions on the Board of Elections. *Id.* at IV ¶ 3. In addition, Gelb seeks an order "vacating the office of Bronx Borough President, pending a rerunning of the primary and general elections with the proviso that sufficient time be provided for the voter to properly learn the correct means of casting a Write–In vote." *Id.* at IV ¶ 4. Finally, Gelb asks for "[s]uch other and further relief as to this court seems, just, proper and equitable [2]." *Id.* at IV ¶ 5.

### Discussion

#### The Motion to Dismiss

■ On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court's function is to assess the legal feasibility of the complaint. *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). The issue "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). All materials facts alleged in the complaint must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Hernandez v. Coughlin,* 18 F.3d 133, 135 (2d Cir.), *cert. denied* —— U.S.

——, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994), (citation omitted). Dismissal is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Ricciuti v. NYC Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted)).

■ To determine the legal viability of a complaint, a court considers: (1) the facts stated on the face of the complaint; (2) documents appended to the complaint; (3) documents incorporated in the complaint by reference; and (4) matters of which judicial notice may be taken. *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994), (citing *Allen v. West-Point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)). *See also Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993) (same).

At the outset, I note that although Gelb does not specifically identify the federal statute underlying his cause of action, I will treat his complaint as one brought pursuant to 42 U.S.C. § 1983 ("§ 1983") [3]. To maintain a § 1983 action, the conduct complained of (1)

---

**2.** Gelb requested that the New York State Board of Elections provide him with materials relating to a hearing held concerning complaints he filed with that body. In response, the New York State Board of Elections provided materials to Gelb and the Court. Among these materials was a cryptic letter, dated November 15, 1990, by New York State Board of Elections Deputy Counsel Stanley L. Zalen. The letter, which is addressed to Gelb, made me pause. It provides:

> The New York State Board of Elections has thoroughly reviewed the complaints sent by you to Attorney General Robert Abrams and to the Bronx County District Attorney concerning the election for 14th Councilmanic District in November 1989. Those complaints were forwarded to this office.
> The New York City Campaign Finance Board was created pursuant to a New York City local law. As such the State Board of Elections has no jurisdiction over any complaints related to that law.
> There is no violation of law by the New York City Board of Elections in failing to give specific instructions on its sample ballots for voting by write-in vote. However, the Election Law

> Section 8–102(1)(g) does require that pencils be present in the voting booth. Accordingly, the attached letter has been sent to the New York City Board of Elections.

I was a member of the Board of Directors of the New York City Campaign Finance Board until I took the bench in October 1992. I have been unable to determine from the papers what complaints Gelb may have made to the New York City Campaign Finance Board. I have no recollection of any matter involving Gelb. This action, however, does not implicate the New York City Campaign Finance Board because Gelb's complaint implicates the manner in which the elections were run rather than how the campaigns were financed. Furthermore, the acts described in the above letter do not concern the 1993 primary and general elections, which are the subject of the instant action. Therefore, I see no reason to recuse myself from this motion, but I invite the parties to inform me of any facts that might warrant reconsideration of this decision.

**3.** Defendants do not object to treating this action as one brought pursuant to § 1983. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss at 4 n. 1.

must have been committed by a person acting under color of state law, and (2) deprived a person of rights, privileges, or immunities secured by the Constitution or the law of the United States. *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994).

The Supreme Court has held "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). To protect the integrity of the electoral process, the Supreme Court has derived a number of voting related rights from the First and Fourteenth Amendments. *New Alliance Party v. New York State Bd. of Elections,* 861 F.Supp. 282, 293 (S.D.N.Y. 1994) (Ward, J.) (citing cases). *See, e.g., Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (right to cast vote effectively denied by state laws imposing burdensome regulations on third-party candidates); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (state poll tax unconstitutional because voter qualifications have no relationship to wealth); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (redistricting designed to deny minority voting power unconstitutional). Thus, voting rights case law stands:

> poised between procedural due process, with its guarantee that an individual may participate in the application of general rules to that individual's particular situation, and the first amendment, with its guarantee that an individual be allowed to participate in the most general communicative processes that determine the contours of our social and political thought. At the same time, election-related rights display the special feature that the *equality* with which they are made available, rather than the *fact* of their availability or absence, ordinarily proves decisive.

Laurence H. Tribe, *American Constitutional Law,* 2d. Ed., § 13–1 at 1062 (1988).

■■■ Although voting rights are of " 'fundamental significance under our constitutional structure,' " the Supreme Court has held that states may enact "substantial" regulations that affect an individual's right to vote and to associate for political ends in order to ensure an honest and orderly election. *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (quoting *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979))[4]. Thus, the Supreme Court has rejected the application of strict scrutiny to every voting rights case. *Id.* Instead, a flexible standard of review is employed, whereby the degree of scrutiny increases with the severity of the restriction imposed by the challenged statute or state action. *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). *See also New Alliance Party,* 861 F.Supp. at 293 n. 12 (same). The key component to this flexible standard of review is a balancing test, where the court weighs the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the "precise interests put forward by the State as justifications for the burden imposed by its rule...." *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063 (internal quotations omitted).

■ Defendants here categorize Gelb's Final Amended Complaint as seeking relief primarily under the Due Process and Equal Protection Clauses. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss (hereinafter "Defs' Memorandum") at 5–7. Defendants argue that the Second Circuit's decision in *Lunde v. Oldi,* 808 F.2d 219 (2d Cir.1986) (per curiam), requires dismissal of Gelb's Due Process claims. Plaintiff in *Lunde* brought suit after the North

---

4. The Supreme Court has upheld numerous comprehensive regulatory schemes that affect voting related rights. *See, e.g., Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (states may restrict office holders from running for other political offices until their term expires or they resign from office); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (state may require candidates to show significant community support before placing them on ballot).

Castle Board of Elections refused to count his ballot. The district court dismissed the action, *inter alia*, because recovery under § 1983 requires more than allegations of negligence on the part of public officials. The Second Circuit affirmed on this ground, observing that the Due Process Clause was intended to protect the individual from abusive rather than negligent government conduct. *Id.* at 221 (citing *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)). In any § 1983 suit, an allegation of merely negligent conduct fails to state a claim under the Due Process Clause of the Fourteenth Amendment. *Id.*

Defendants maintain that Gelb does not allege that their conduct was intentional or even reckless. Rather, defendants argue that Gelb simply alleges they failed to exercise due care. In support of this position, defendants point to portions of Gelb's Final Amended Complaint where he states that the "errors and omissions" committed by defendants were "too glaring to be inadvertent." Final Amended Complaint at II ¶ 1. Gelb also describes the actions by defendants as "arbitrary, that is, unrelated to any proper function of Government [sic.]." *Id.* at III ¶ 5.

■■■ Courts, however, must construe *pro se* papers liberally. *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) (per curiam). Read fairly and in its entirety, I find Gelb has sufficiently alleged that the "errors and omissions" committed during the primary and general elections were intentional. In his Final Amended Complaint, Gelb describes a series of "errors and omissions" committed by defendants in order to discourage write-in candidacies. The alleged pattern of acts, according to Gelb, designed to thwart write-in candidacies included ballots without spaces for write-in candidates, voting machines lacking proper instructions about the write-in procedure, incomplete display cards, and pencils missing from voting booths in order to compromise the secrecy of the balloting process. Gelb alleges that the number of irregularities associated with the write-in process in the primary and general elections was "too glaring to be inadvertant [sic.]." Final Compl. at I; *see also* Request to Deny Defendants' Motion to Dismiss, dated May 18, 1994, at I, ¶ 2 (stating that "too glaring to be inadvertant [sic.]" means deliberate or intentional). I, therefore, find in the context of Gelb's allegations, that his Final Amended Complaint sufficiently states a Due Process claim under § 1983. *See Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986) (freedom to advance political beliefs is an "inseparable" aspect of liberty guaranteed by Due Process Clause of Fourteenth Amendment).

■■■ For similar reasons, I find that Gelb has sufficiently stated a claim under the Equal Protection Clause. Defendants argue that Gelb's Equal Protection claim "fails to allege any intentional or purposeful discrimination by defendants against him personally, or against any particular class of voters or candidates of which he is a member ... [nor does it] allege that he was discriminated against because of his wealth, geographical location, political beliefs or party affiliation." Defs' Memorandum at 8.

In *Williams*, the Supreme Court held that ballot access restrictions that gave established political parties a distinct advantage violated equal protection. At issue in *Williams* was an Ohio law that placed numerous burdens on new political parties, including a requirement that third party candidates file a petition signed by a number of electors equal to fifteen percent of the total number of votes cast in the last gubernatorial election. Subjecting Ohio's voting scheme to strict scrutiny, the Supreme Court held:

No extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate. The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot ... The fact is, however, that the Ohio system does

not merely favor a 'two-party system'; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as old parties have had in the past.

*Id.* at 31–32, 89 S.Ct. at 10–11.

Applying *Williams* by analogy, I find that Gelb states a claim under the Equal Protection Clause. Although Gelb does not challenge the state's election laws as did the petitioner in *Williams,* the effect of defendants' actions here is the same. By allegedly engaging in acts and omissions designed to undermine write-in candidacies, the effect of defendants' actions was to bolster the candidacies of people nominated by the established parties. *See Norman v. Reed,* 502 U.S. 279, 287, 112 S.Ct. 698, 704, 116 L.Ed.2d 711 (1992) (under First and Fourteenth Amendments, citizens have the right to create and develop new political parties).

Contrary to defendants' suggestion, my conclusion is reinforced by the Supreme Court's decision in *Burdick.* In *Burdick,* the Supreme Court rejected a First and Fourteenth Amendment challenge to Hawaii's ban on write-in voting. The Court upheld the ban, however, only because the ban's impact on voting rights was compensated for by Hawaii's provision of three alternatives that provided easy access to the ballot for independent and third party candidates. *Burdick,* 504 U.S. at 434–438, 112 S.Ct. at 2064–65. *Burdick,* therefore, reaffirmed the principle that states cannot structure elections in a manner that favors candidates of established parties.

■ Defendants also move to dismiss any Fourth Amendment claims made by Gelb. The primary purpose of the Fourth Amendment is to protect citizens against unreasonable searches and seizures performed by the government. *See Dunaway v. New York,* 442 U.S. 200, 214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979) (Fourth Amendment designed to prevent intrusions upon personal security). After reviewing Gelb's papers and reviewing Fourth Amendment case law, I conclude that Gelb has failed to state any claim for relief under the Fourth Amendment. I, therefore, dismiss any claims based upon the Fourth Amendment.

■ I also dismiss any claims seeking criminal sanctions under NYEL § 7–128 against the Commissioners. Federal courts are courts of limited jurisdiction, and can only take jurisdiction of state law criminal matters in rare circumstances. *See* 28 U.S.C. §§ 1442, 1442(a), and 1443. I find no grounds from Gelb's papers or the relevant case law to support the assertion of jurisdiction under the criminal provisions of the NYEL, and therefore dismiss these claims. If Gelb wishes to file criminal complaint against the Commissioners, he should contact the appropriate state authorities.

### *Pullman Abstention*

■ Finally, defendants urge me to abstain from deciding the federal constitutional issues in this case under the doctrine set forth in *Railroad Comm. of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under the *Pullman* doctrine, federal courts should stay proceedings when a federal constitutional issue may be mooted or altered by a state court ruling on state law. *Youell v. Exxon Corp.,* 48 F.3d 105, 109 (2d Cir.1995) (citing *Pullman,* 312 U.S. at 496, 61 S.Ct. at 643). Federal courts have, however, a " 'virtually unflagging obligation' " to exercise jurisdiction over all cases properly before them. *Id.* at 109–110 (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817–18, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976)). Therefore, abstention is considered:

an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified only in the exceptional circum-

**518**

stances where the order to the parties to repair to the state court would clearly serve an important countervailing interest. *Williams v. Lambert*, 46 F.3d 1275, 1281 (2d Cir.1995) (quoting *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244). The Supreme Court has cautioned that "because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in federal court, abstention must be invoked only in special circumstances and only upon careful consideration of the facts of each case." *Harris County Comm'rs. Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975) (internal quotations and citations omitted).

 *Pullman* abstention may be appropriate where there is an action pending in a state court that may resolve the state law question underlying the federal claim, or where the state law issues concern matters peculiarly within the province of local courts. *Id.* (citations omitted). *Pullman* abstention is applied in the Second Circuit only where (1) the state statute is unclear or the issue of state law uncertain; (2) resolution of the federal issue depends upon the interpretation given to an ambiguous state provision; and (3) the state law is susceptible of an interpretation that would avoid or modify the federal constitutional issue. *Williams*, 46 F.3d at 1281 (citing *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 594 (2d Cir. 1989)).

 Defendants rely upon an ambiguity in the NYEL provisions that concern primary elections as the basis for their *Pullman* abstention argument. Specifically, defendants maintain that the NYEL is unclear on whether the opportunity to write-in votes is guaranteed during primary elections. Before addressing this issue, I note, however, that defendants concede that there is no such ambiguity with respect to the general election provisions of the NYEL. *See* Defs' Memorandum at 16. Therefore, the only issue with respect to the causes of action arising from acts and omissions committed during the general election is whether the defendants committed these acts intentionally. Such a factual inquiry can be resolved in

a federal court just as efficiently and effectively as in a state court. *Cf. Youell*, 48 F.3d at 110–111 (where resolution of federal question involves determination of intent, federal court should not abstain).

I am also not convinced that there is sufficient ambiguity in the NYEL to warrant abstention. Defendants argue that "plaintiff's federal constitutional claims turn on whether or not the NYS Election Law guarantees the opportunity to cast write-in votes in every primary election held." Defs' Memorandum at 12. Defendants, however, concede that NYEL §§ 7–114 (form of ballots for primary election) and 7–122(1)(b) (form of absentee ballots) both specify that spaces shall be provided for write-in votes. *Id.* at 12–13. Defendants also concede that NYEL § 7–202 "arguably mandates" the opportunity to cast write-in votes because that statute states that voting machines "must permit a voter to vote for any person for any office, whether or not nominated as a candidate by any party or independent body without a ballot, or any part thereof, being removed from the machine at any time." *See id.* at 13.

Defendants proffer, however, two reasons why the NYEL is unclear as to whether write-in voting is guaranteed during primaries. First, they maintain, § 7–202 may not be applicable to primaries because the language "whether or not nominated" suggests that the nomination process (i.e. the primary) has already occurred. Defendants argue that § 7–202 would have to read "whether or not nominated or designated" in order to apply unambiguously to primary elections. *Cf.* NYEL § 8–308(1) (employing "nominated or designated" language with respect to voting machine write-ins).

Second, defendants claim that NYEL §§ 114(1)(a), 7–104(4)(b) and 7–116(6) conflict. Section 7–114(1)(a) is entitled "ballots; form for primary election," and provides in part:

The face of the official ballot for a primary election shall be divided into parts . . . the first part shall be entitled . . . 'Candidates for nomination for public office' . . . the second part shall be entitled . . . 'Candi-

dates for party positions.' When necessary, a part may be divided into two or more columns or rows, but the names of all persons designated for the same office or party position shall be in the same column of row.

N.Y.Elec.Law § 7–114(1)(a) (McKinney's 1995 Supp.). Defendants maintain that under § 7–114(1)(a), a primary ballot may take the form of a patchwork or a grid design. A patchwork ballot lists several offices in each column, while in a grid ballot each parties' candidates appear in a single vertical or horizontal row underneath or besides a list of the offices to be filled. *See* Defs' Memorandum at 14. In contrast, § 7–104(4)(b), which governs the form of the general election ballot, provides:

> The titles of offices may be arranged horizontally, with the names of candidates for an office and slot or device for write-in ballots for such office arranged vertically under the title of the office, or the titles of offices may be arranged vertically, with the names of candidates for an office and the slot or device for write-in ballots for such office arranged horizontally opposite the title of the office.

N.Y.Elec.Law § 7–104(4)(b) (McKinney's 1995 Supp.). According to defendants, § 7–104(4)(b) requires general election ballots to be designed in grid form. Thus, defendants argue, a conflict may arise when § 7–116(6) is read in conjunction with § 7–114(1)(a). Section 7–116(6) requires that "no blank spaces shall separate the names of candidates actually running for office ... and no blank spaces shall separate any two such offices or positions which appear on such voting machine in the same column or row." N.Y.Elec.Law § 7–116(6) (McKinney's 1978[5]). Defendants argue that if the Board

ever chooses to use a patchwork primary ballot, as authorized by § 7–114(1)(a), then it would be impossible to insert the requisite blank spaces required by § 7–116(6).

Even assuming that the supposedly conflicting language of § 7–116(6) was in force during the 1993 elections, defendants' interpretation of that provision is questionable. The statute essentially requires New York City to take additional steps when designing ballots. Although § 7–116(6) is silent on the issue of whether New York City may use a patchwork ballot, for the purposes of the instant abstention question it is reasonable to infer that § 7–116(6) eliminates the patchwork ballot option in New York City and so does not conflict with § 7–104(4)(b). *See Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 236–37, 104 S.Ct. 2321, 2326–28, 81 L.Ed.2d 186 (1984) (*Pullman* inquiry is not whether state statute can be interpreted in more than way, rather statute must be "obviously susceptible of limiting instruction.").

Defendants' ambiguity argument is further undermined by an opinion of the Attorney General of the State of New York, dated August 28, 1963, which found that under New York statutory and case law there is a right to write-in voting during a primary. *See* State of New York Opinions of the Attorney General for the Year Ending December 31, 1963 at 178–79 (nothing in case law or NYEL suggests that write-in voting during primaries is prohibited)[6].

Other reasons counsel against abstention. First, there is no pending state court proceeding that may resolve the issues before me on state law grounds. Moreover, Gelb may suffer serious harm if there are any further delays in this litigation. A number of important positions will be filled in the 1996 elections, including several high profile municipal offices. As such, efforts to form cam-

---

**5.** Section 7–116(6) no longer contains the blank spaces language cited by defendants. The amended § 7–116(6) provides, in relevant part:

> The names of candidates designated for such public office or party position in the primary shall be placed under the title of the office or position in the alphabetical order of their surnames....

N.Y.Elec.Law § 7–116(6) (McKinney's 1995 Supp.). It is unclear from defendants' papers, as well as from the legislative history, when the

blank spaces language cited by defendants was deleted from the statute. *See, e.g.,* History and Statutory Notes of § 7–116 (McKinney's 1995 Supp.) (listing 1990 amendments to subdivision (6) but making no mention of removal of blank spaces language).

**6.** The right to write-in candidates during a primary election may be more settled than defendants believe. NYEL § 6–164, which is entitled "Primary, uncontested; opportunity to ballot," provides in part:

paigns for the 1996 elections are already underway. If I were to stay proceedings in the instant action, it is unlikely that any possible remedial actions could be implemented before the 1996 elections. *See Youell,* 48 F.3d at 111 (presence of federal question weighs heavily against abstention).

Gelb filed a complaint alleging, *inter alia,* the same voting secrecy violations set forth in causes of action four and seven after the November 1989 election for the 14th Councilmanic District in the Bronx. The New York State Board of Elections investigated Gelb's claim, and in a letter dated November 15, 1990, informed the defendant Board that:

> [p]encils were not in the voting booths for that election [the November 1989 election]. However, pencils are required under Election Law Section 8–102(1)(g). Please make every effort to ensure that pencils are always provided within every voting machine for each general election.

Despite this mild reprimand, the defendant Board allegedly repeated this conduct during the 1993 elections. Thus, the need for more immediate remedial steps is clear. *See Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (abstention not appropriate where state court adjudication would not eliminate need for consideration of federal constitutional question).

Because the state law questions are not as ambiguous, unclear, or unsettled as defendants claim, and because resolution of the state law issue will not avoid the federal constitutional question, I decline to abstain from hearing this action.

### Conclusion

For the reasons discussed above, defendants' motion to dismiss is granted in part and denied in part. I also deny defendants' request to abstain from hearing this action. The Clerk of the Court is directed to dismiss

any claims based upon the Fourth Amendment of the United States Constitution as well as claims seeking to prosecute the individual defendants for any criminal violations of state law. **The parties are directed to appear at a status conference on April 21, 1995 at 2:30 pm.** At this conference, which will be held in courtroom 14B of the new federal courthouse located at 500 Pearl Street, the Court will establish a schedule for the completion of discovery and set a trial date. Mr. Gelb is advised that while the Court found his papers clear and well argued, given the complex factual questions remaining to be resolved, he should consider retaining counsel. Mr. Gelb should come to the status conference prepared to discuss whether he qualifies for placement on the Southern District Pro Bono Panel List, which assists *pro se* litigants in securing attorneys who will provide their services at no charge.

**SO ORDERED.**

---

Enrolled members of a party entitled to vote in the nomination of a candidate for public office ... in a primary election of such party, and equal in number to at least the number of signers required to designate a candidate for such office or position may file ... a petition requesting an opportunity to write in the name of a candidate or candidates, who need not be specified, for such office or position. Upon receipt of such a petition, such office or position shall be deemed contested and the primary ballots of the party shall afford an opportunity to vote thereon.

N.Y.Elec.Law § 6–164 (McKinney's 1995 Supp.). While I am willing to reserve decision on this question pending further briefing, I note that § 6–164 appears to undermine defendants' arguments.