110 F.3d 663
 1997 A.M.C. 1617, 97 Cal. Daily Op. Serv. 2266,
97 Daily Journal D.A.R. 4141
 AQUA-MARINE CONSTRUCTORS, INC., an Oregon corporation,
Plaintiff-Appellee,
v.
Mike BANKS, individually and d/b/a Mike Banks Company, Defendant;
Polaris Insurance Company, Ltd., a foreign corporation,
Defendant-Appellant.
POLARIS INSURANCE COMPANY, LTD., a foreign corporation,
Counter-Claimant-Cross-Claimant-Third-Party Plaintiff,
v.
AQUA-MARINE CONSTRUCTORS, INC., an Oregon corporation,
Counter-Defendant,
and
Mike Banks, individually and d/b/a Mike Banks Company,
Cross-Defendants,
and
Latham Smith, individually and d/b/a Smith Maritime; The
Tugboat Elizabeth II; Pearcy Marine, Inc., a Colorado
corporation; Jim Pearcy, an individual; The Tugboat Garnet
Banks; The Tugboat John Banks; and Barge 242, Third-Party
Cross-Defendants.
 No. 95-36021.
 United States Court of Appeals,Ninth Circuit.
 Argued and Submitted Jan. 6, 1997.
Decided March 28, 1997.
 
 Mary Ellen Page Farr, Kell, Alterman and Runstein, Portland, OR, for defendant-appellant Polaris Insurance Company, Ltd.
 Joseph L. Gimbrone, Gilson & Heaton, San Diego, CA, for defendant-appellant Polaris Insurance Company, Ltd.
 Karen O'Kasey, C. Kent Roberts, Schwabe, Williamson & Wyatt, Portland, OR, for plaintiff-appellee Aqua-Marine Constructors, Inc.
 Appeal from the United States District Court for the District of Oregon, Helen J. Frye, District Judge, Presiding. D.C. No. CV-92-1161-HJF.
 Before PREGERSON and THOMAS, Circuit Judges, and REED, Jr.,* District Judge.
 EDWARD C. REED, Jr., District Judge:
 Introduction
 Polaris Insurance Company appeals the order of the district court granting summary judgment in favor of Aqua-Marine Constructors, in Aqua-Marine's action against Polaris on a surety bond executed by Michael Banks and Polaris in favor of Aqua-Marine.
 I. Facts
 Aqua-Marine Constructors, an Oregon corporation, owns an oceangoing barge, the "Aqua 242." In May 1992 Aqua-Marine entered into a bareboat charter agreement with Michael Banks, a resident of California. Under the terms of the charter party, Banks was to take possession of the barge at Everett, Washington, make monthly charter hire payments in the amount of $24,000.00, and redeliver the barge to Aqua-Marine at Everett. The charter party obligated Banks to at least three months' hire, and further required him to obtain a bond securing the payment of the charter hire and the proper redelivery of the barge at the termination of the charter period.[1] Banks did obtain a performance bond which he and Polaris Insurance Company executed on May 15, 1992, in favor of Aqua-Marine.[2] Polaris is an insurance carrier incorporated under the laws of the Republic of Costa Rica.
 By the beginning of August 1992, Banks was in default of his obligation to make charter hire payments. At some point the barge apparently came into the possession of "Latham Smith," a towage operator, without Aqua-Marine's approval.[3] Smith recorded a lien against the barge, presumably for nonpayment of services rendered the Aqua 242, and caused the vessel to be arrested by federal marshals in Charleston, South Carolina, on August 17, 1992.
 The shipowner, Aqua-Marine, demanded that Banks' surety, Polaris Insurance, rescue the barge, make redelivery of the barge to Aqua-Marine, and pay Banks' charter hire arrears. Polaris refused, on the grounds (1) that its obligations under the performance bond had been suspended, and coverage canceled, in July 1992, after Michael Banks failed to tender his premium payments and (2) that Banks had never tendered the collateral required by the terms of the performance bond, thereby reducing Banks' coverage to zero.
 II. Proceedings Below
 In September 1992 Aqua-Marine sued both Banks and Polaris in an Oregon federal court, alleging diversity jurisdiction. On August 5, 1993 Polaris filed an answer and cross-complaint, alleging admiralty jurisdiction.
 An Oregon insurance statute requires an insurance carrier not certified to do business in Oregon to deposit funds into court to abide a future judgment before filing any defensive pleadings in a civil action against it. On December 9, 1993, the district court, relying on this statute, struck Polaris' answer and cross-complaint, and ordered Polaris to deposit $150,000.00 in court. Polaris appealed the district court's ruling; that appeal was dismissed by this court for want of jurisdiction. Polaris refused to make the deposit, and on August 1, 1994 was cited for contempt. On September 7, 1995 the district court granted Aqua-Marine's motion for summary judgment, and entered judgment in favor of Aqua-Marine, and against Polaris and Banks. On October 3, 1995 Polaris instituted this appeal from the judgment of the district court.
 III. Discussion
 Polaris assigns as error the district court's choice of law and its construction of several Oregon insurance statutes. These assignments of error involve purely legal questions; our review of the district court's rulings is therefore de novo. Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1262 (9th Cir.1996) (district court's statutory construction reviewed de novo ); Jenkins v. Whittaker Corp., 785 F.2d 720, 724 (9th Cir.) (district court's choice of law reviewed de novo ), cert. denied, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986).
 A. Preemption
 Polaris argues that the performance bond is a maritime contract, and that therefore any dispute arising out of the contract must be resolved purely by reference to federal maritime law; Polaris maintains, essentially, that to the extent Oregon's insurance statutes purport to apply to maritime insurance contracts, they are preempted by federal maritime law. Aqua-Marine, for its part, contends that the performance bond is not a maritime contract at all, or if it is, that the Oregon insurance statute nevertheless governs its action against Polaris.
 The question whether the performance bond is a maritime contract is irrelevant for the purpose of determining whether Oregon's bond requirement statute is preempted by federal maritime law: Under Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), disputes over maritime insurance contracts may be governed by state law, in the same manner as non-maritime insurance contracts, as long as the state law does not clearly conflict with federal maritime law. See Askew v. American Waterways Operators, Inc., 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973). Polaris has not asserted, and we fail to discern, any direct conflict between the Oregon statute applied by the district court and federal maritime law, either statute or decisional.
 Federal maritime jurisdiction is not, and has never been, entirely exclusive. American Dredging Co. v. Miller, 510 U.S. 443, 446, 114 S.Ct. 981, 984-85, 127 L.Ed.2d 285 (1994) (citing the "saving to suitors" clause of the federal Judiciary Act of 1789, § 9, 1 Stat. 76-77, current version at 28 U.S.C. § 1333(1)). State and federal authorities jointly wield control over maritime matters. Romero v. International Terminal Operating Co., 358 U.S. 354, 374, 79 S.Ct. 468, 481, 3 L.Ed.2d 368 (1959). It is, for example, beyond question that state courts may not offer a litigant a remedy in rem for any cause of action cognizable in admiralty. Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 124, 44 S.Ct. 274, 277, 68 L.Ed. 582 (1924); The Moses Taylor, 71 U.S. (4 Wall.) 411, 431, 18 L.Ed. 397 (1866). Nor may state workers compensation statutes be applied to personal injury actions over which the federal courts exercise admiralty jurisdiction. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). But a state court may, in exercising jurisdiction in personam over a maritime claim, " 'adopt such remedies, and ... attach to them such incidents, as it sees fit so long as it does not attempt to make changes in the substantive maritime law.' " American Dredging, 510 U.S. at 447, 114 S.Ct. at 985 (quoting Madruga v. Superior Court, 346 U.S. 556, 561, 74 S.Ct. 298, 301, 98 L.Ed. 290 (1954)) (further internal quotation marks omitted). State-created maritime remedies offend federal admiralty prerogatives only where the state remedy "works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." Jensen, 244 U.S. at 216, 37 S.Ct. at 529. The issue, then, is whether Oregon's requirement that an unauthorized insurer post bond before filing any pleading in an action against it does violence to any "characteristic feature" of admiralty or otherwise sounds a note so discordant as to destroy the proper harmony of federal maritime law. American Dredging, 510 U.S. at 447, 114 S.Ct. at 985.
 Oregon's statute imposes a significant burden on a defendant unauthorized insurer. This burden is not uniform: some states may require such insurers to post security before appearing as a defendant in a civil action, and some states may not. But lack of uniformity may not by itself mandate federal preemption. The Supreme Court has noted that "it would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation. That this may be done to some extent cannot be denied." Jensen, 244 U.S. at 216, 37 S.Ct. at 529 (quoted in American Dredging, 510 U.S. at 451, 114 S.Ct. at 987).
 The Court in American Dredging reversed the judgment of the lower court that Louisiana's forum non conveniens rule made such inroads into the proper uniformity of federal maritime law as to be preempted. The Court was in large part persuaded that the Louisiana rule was "procedural" rather than "substantive," i.e. application of the state rule did not "bear upon the substantive right to recover, and [was] not a rule upon which maritime actors rely in making decisions about primary conduct--how to manage their business and what precautions to take." 510 U.S. at 454, 114 S.Ct. at 988-89. At least in Justice Souter's mind,
 [t]he characterization of a state rule as substantive or procedural will be a sound surrogate for the conclusion that would follow from a more discursive preemption analysis. The distinction between substance and procedure will, however, sometimes be obscure. As to those close cases, how a given rule is characterized for purposes of determining whether federal maritime law preempts state law will turn on whether the state rule unduly interferes with the federal interest in maintaining the free flow of maritime commerce.
 Id. at 457-58, 114 S.Ct. at 990 (Souter, J., concurring).
 
 
 1
 The instant appeal is one of those close cases. The state rule prohibits a defendant unauthorized insurer from filing any pleading in an action against it before first depositing with the court funds sufficient to satisfy any judgment which might be entered. This rule is one upon which a maritime actor might rely in making decisions about primary conduct: It seems entirely possible that maritime insurers might seek to avoid like the plague those jurisdictions affording plaintiffs such a provisional remedy. Maritime insurers might refuse to execute insurance contracts in such states, or refuse to cover risks in those states. It seems even more likely that maritime insurers, having insured an Oregon resident, or having underwritten an Oregon risk, will order at least their secondary conduct with the Oregon provisional remedy in mind. That is, the knowledge that Oregon will require the deposit by a defendant unauthorized insurer of enough money to cover the plaintiff's claims may well figure in litigants' decisions as to where to bring suit, or where to subject themselves to suit. See id. at 455, 114 S.Ct. at 989. Because the subject state rule could conceivably influence both primary and secondary conduct, the dialectic of substance and procedure yields no ready answer to the question posed by the instant appeal. It remains, then, to be determined whether Oregon's rule "unduly interferes" with the federal interest in untrammeled maritime commercial activity. See Wilburn Boat, 348 U.S. at 321, 75 S.Ct. at 374-75 (requiring federal admiralty courts to apply state insurance law where applicable to marine underwriters so long as such laws do not intrude upon federal admiralty principles); Youell v. Exxon Corp., 48 F.3d 105, 110 (2d Cir.), cert. granted and judgment vacated on other grounds, 516 U.S. 801, 116 S.Ct. 43, 133 L.Ed.2d 9 (1995).
 
 
 2
 One panel of this court has addressed the very question presented by this appeal. In Bank of San Pedro v. Forbes Westar, Inc., 53 F.3d 273 (9th Cir.1995), a shipowner sued its hull insurance carrier, seeking recovery under the policy for the loss of the vessel. In the district court, the shipowner had moved to strike the carrier's answer for non-compliance with a California statute requiring unauthorized foreign insurers to post security sufficient to satisfy the judgment prior to filing any pleading in a civil action against it. Citing Wilburn and American Dredging, the appellate court ruled that because the statutory requirement was part of the state's regulation of insurance, and was "the kind of local policy that federal courts are to apply when sitting in admiralty," it was bound to apply the California bond requirement statute to the admiralty case at bar. Bank of San Pedro, 53 F.3d at 275; see Cal. Ins.Code § 1616.
 
 
 3
 The Bank of San Pedro panel did not find the California bond requirement to be procedural rather than substantive, nor did it find explicitly that the statute did not conflict with federal maritime law or policy. Instead, the Bank of San Pedro court reasoned that "[t]o disregard [the statute] would be to damage the mechanism by which California regulates insurance." 53 F.3d at 275. This recognition, while correct, does not supplant the preemption analysis required by American Dredging.
 
 
 4
 Other federal courts have grappled with the same question. In Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation, 605 F.2d 648 (2d Cir.1979), the Second Circuit ruled that prejudgment remedies are not only procedural in nature, but also entirely consistent with traditional admiralty practice. See Signal Capital Corp. v. Eastern Marine Management, Inc., 899 F.Supp. 1167, 1169 (S.D.N.Y.1995) (approving imposition of New York bond requirement upon defendant foreign insurer, and citing Compagnie Nationale Algerienne as support for proposition that such prejudgment remedy is (a) procedural and (b) not in conflict with federal maritime law). In Toomer v. Southwest Casualty Insurance Co., 231 F.Supp. 542 (S.D.Tex.1964), which dealt with a Texas bond requirement statute more or less identical to the Oregon statute at issue in the present matter, the court ruled that the Texas statute neither contravened any Act of Congress, nor prejudiced any characteristic feature of, or interfered with the uniform application of, federal maritime law, and therefore could lawfully be applied in admiralty. Toomer, 231 F.Supp. at 543.[4]
 
 
 5
 What is more, the federal Supplemental Rules for Certain Admiralty and Maritime Claims explicitly incorporate by reference state provisional remedies: In admiralty actions in personam "the plaintiff may ... invoke the remedies provided by state law for attachment and garnishment or similar seizure of the defendant's property." Fed.R.Civ.P. Supp. R. B(1); see Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc., 56 F.3d 394, 401-02 n. 4 (2d Cir.1995). To the extent the Oregon bond requirement statute works a prejudgment "seizure" of the property of an unauthorized foreign insurer, then, the statute not only does not conflict with federal maritime rules, it is actually incorporated by reference in the federal rules of procedure for maritime claims.
 
 B. Choice of Law
 
 6
 The Oregon bond requirement statute is therefore not preempted by federal maritime law, but may lawfully be applied to an action before a federal court sitting in admiralty. The question remains, however, whether Oregon law should apply to this action at all. Defendant-Appellant Polaris argues that it should not. Polaris argues, first, that the clause in the charter party selecting Washington as the State whose law should apply to disputes over the charter party should apply with equal force to the instant dispute over the performance bond. Polaris argues alternatively that because neither the execution of the bond, nor the voyage contemplated by the charter party, took place in Oregon, that Oregon law should not apply to any action on the bond.
 
 
 7
 In order to settle any choice of law issue, we must first determine whether this court's jurisdiction over the subject matter of this action, and that of the district court, derives from the diversity of citizenship of the parties, or from the maritime nature of the contract sued on. This is so because a federal court sitting in diversity applies the choice-of-law rules of the forum state, Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941), whereas a federal court sitting in admiralty must apply federal maritime choice-of-law rules. Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1080 (2d Cir.1993) (citing Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 889-90, 6 L.Ed.2d 56 (1961)), cert. denied, 511 U.S. 1018, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994); Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse, 996 F.2d 506, 513 (2d Cir.1993) (citing rule of Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409-11, 74 S.Ct. 202, 204-06, 98 L.Ed. 143 (1953), that federal admiralty court must apply existing federal maritime law); Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 890 (5th Cir.), cert. denied, 502 U.S. 901, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991); State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 414 (2d Cir.1990); Gonzalez v. Naviera Neptuno A.A., 832 F.2d 876, 880 n. 3 (5th Cir.1987); Illinois Constructors Corp. v. Morency & Assocs., Inc., 802 F.Supp. 185, 187-88 (N.D.Ill.1992).
 
 
 8
 The admiralty jurisdiction of the federal courts extends to all maritime causes of action. 28 U.S.C. § 1333(1). But is Aqua-Marine's cause of action on the performance bond a maritime claim?
 
 
 9
 As a general rule, admiralty law applies to all maritime contracts. Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 29, 20 L.Ed. 90 (1870). Justice Story long ago announced the rule that a contract relating to the navigation, business or commerce of the sea is a maritime contract, an action on which may be brought in admiralty. De Lovio v. Boit, 7 F. Cas. 418, 444 (C.C.Mass.1815) (No. 3,776). More recently, it has been held that a contract is maritime if it relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea, or to maritime employment. J.A.R., Inc. v. M/V Lady Lucille, 963 F.2d 96, 98 (5th Cir.1992). It is, therefore, the subject matter (rather than the place of execution or place of performance) of a contract which determines the existence of federal maritime jurisdiction over a contractual claim. North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919); Rea v. The Eclipse, 135 U.S. 599, 608, 10 S.Ct. 873, 875-76, 34 L.Ed. 269 (1890); The Steamboat Orleans v. Phoebus, 36 U.S. (11 Pet.) 175, 183, 9 L.Ed. 677 (1837); Genetics Int'l v. Cormorant Bulk Carriers, Inc., 877 F.2d 806, 808 (9th Cir.1989). It is the character of the work to be performed under a contract which determines whether the contract is maritime. Hinkins S.S. Agency, Inc. v. Freighters, Inc., 498 F.2d 411, 412 (9th Cir.1974) (citing Hall Bros., 249 U.S. at 125, 39 S.Ct. at 222-23). If the subject of the contract relates to the ship and its uses as such, or to commerce or navigation on navigable waters, or to transportation by sea, the contract is maritime. Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 302 (2d Cir.1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). If the obligation sued on is "directly and in essence" a maritime obligation, for the performance of maritime service or transactions, a suit on the obligation is cognizable in admiralty. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 766 (3d Cir.) (quoting Pacific Sur. Co. v. Leatham & Smith Towing & Wrecking Co., 151 F. 440, 443-44 (7th Cir.1907)), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963).
 
 
 10
 The bareboat charter executed by Plaintiff-Appellee Aqua-Marine, the owner of the boat, and Michael Banks, the charterer, required Banks to obtain a bond securing payment of the charter hire and redelivery of the boat at the termination of the charter. Defendant-Appellant Polaris was not a party to the bareboat charter, and the charter party itself is not the subject of this appeal. Aqua-Marine sued Polaris for breach of the latter's obligations under the performance bond. Aqua-Marine has argued that the performance bond is simply not a maritime contract, but a garden-variety insurance policy, subject to state regulation in the same manner as any other contract of insurance.
 
 
 11
 Normally, a performance bond which compensates an obligee for loss in the event of nonperformance by the principal obligor is not a maritime contract. Leatham & Smith, id.; see also Buttner v. Adams, 236 F. 105, 107 (9th Cir.1916). But the performance bond at issue in the present appeal obligated Polaris to perform Banks' obligations under the charter in the event of Banks' default. In particular, the performance bond required Polaris to assume Banks' obligation, under the charter party, to redeliver the barge to Aqua-Marine at the end of the charter period. Such a contract is quintessentially maritime, for it requires the obligor to perform a duty uniquely maritime in character. The leading admiralty treatise has declared that
 
 
 12
 a bond securing the performance of a charter party is not a maritime contract for the purposes of admiralty jurisdiction, although the charter party itself is a maritime contract; the surety on the bond neither promises performance of the charter party nor is [s]he authorized to do so; h[er] obligation is merely to pay damages in the event of non-performance. Where, however, there is a promise to perform a charter in the default of another, there is a maritime contract.
 
 
 13
 1 Steven F. Friedell, Benedict on Admiralty § 183, at 12-10 (1996) (footnote omitted). Aqua-Marine's claim against Polaris arises out of Polaris' promise, in the event of a default by the charterer, to return the ship to its home port.
 
 
 14
 A charter party is clearly a maritime contract. In the event of a default by Banks, Polaris was to step into his shoes and perform Banks' duties under the charter party. The bond therefore contemplated Polaris' assumption of Banks' duties under a maritime contract. The bond was not, for example, a contract of insurance whereby Polaris promised to pay money in the event of a loss. In the event of a default, Polaris had undertaken "to assume the performance of the bond, to become the principal obligor, to do the very act promised by [the charterer], to substitute the promisor's performance for the promisee's." Compagnie Francaise De Navigation a Vapeur v. Bonnasse, 19 F.2d 777, 779 (2d Cir.) (emphasis supplied), cert. denied, 275 U.S. 551, 48 S.Ct. 114, 72 L.Ed. 421 (1927); see also The Fort Armstrong, 51 F.2d 1063, 1065 (S.D.Ga.1931) (recognizing that while "the ultimate liability of the surety would be measured by money, it was in terms bound by all the obligations of its principal, and the obligation of the principal was to properly perform maritime duties in accordance with his profession"). Accord Japan Line, Ltd. v. Willco Oil Ltd., 424 F.Supp. 1092, 1093 (D.Conn.1976) (ruling that guarantee of performance of maritime contract was enforceable in admiralty); Haller v. Fox, 51 F. 298 (D.Wash.1892) (exercising admiralty jurisdiction over action by shipowner against charterer's surety for unpaid charter hire and for unpaid services and supplies furnished to vessel).[5] Cf. Leatham & Smith, 151 F. at 443; cf. also Interocean Shipping Co. v. National Shipping & Trad. Corp., 462 F.2d 673, 678 (2d Cir.1972) (declaring that agreement to act as surety on a charter party is not a maritime contract).
 
 
 15
 Polaris' obligation to perform the charterer's redelivery obligation was therefore truly and completely maritime in character. South Carolina State Ports Auth. v. Silver Anchor, S.A., 23 F.3d 842, 846 n. 3 (noting that guarantor of principal's maritime obligation may be sued in admiralty) (4th Cir.1994); Rex Oil, Ltd. v. M/V Jacinth, 873 F.2d 82, 86 (5th Cir.1989) (concluding that settlement agreement provision requiring return of vessel to commerce imposed a maritime obligation), cert. denied, 493 U.S. 1043, 110 S.Ct. 836, 107 L.Ed.2d 832 (1990); Davis v. Dittmar, 6 F.2d 141, 142 (2d Cir.1925) (upholding right of holder of third-party's guarantee of another's maritime obligation to sue guarantor in admiralty); Japan Line, 424 F.Supp. at 1093-94 (stating rule that guarantee of performance of another's maritime obligation is itself a maritime contract); Northern Star S.S. Co. of Canada v. Kansas Milling Co., 75 F.Supp. 534, 536 (S.D.N.Y.1947) (ruling guarantee of performance of marine charter a maritime contract). Cf. Eadie v. North Pac. S.S. Co., 217 F. 662 (N.D.Cal.1914) (declining to exercise federal maritime jurisdiction over action on bond requiring charterer's surety to pay only damages in the event of default, rather than guaranteeing performance of any maritime obligation contained in the charter party). Aqua-Marine's action against Polaris is therefore cognizable in admiralty.
 
 
 16
 In sum, actions against sureties on bonds securing performance are cognizable in admiralty if the surety's obligation under the bond is the same as that of the original promisor, but not if the surety is obligated only to pay a sum of money and the duties of the original promisor were otherwise. 7A James W. Moore, Moore's Federal Practice p 260.2, at 3060 (2d ed.1995). Polaris did undertake to assume Banks' obligations under the charter party in the event of a default by Banks. The performance bond is therefore a maritime contract.[6] As the court's admiralty jurisdiction has been affirmatively and properly invoked by Polaris, see Bodden v. Osgood, 879 F.2d 184, 186 (5th Cir.1989), the choice of law to be applied is governed by federal maritime choice of law rules.
 
 
 17
 It is clear that federal maritime law will not preempt state insurance statutes requiring a defendant insurer to post bond before filing any pleadings in the action against it. Oregon has enacted such a statute; Washington has not. Polaris demands that the court apply Washington law.
 
 
 18
 This Circuit has never formally set out the choice of law rules to be applied where the law of more than one State vies for application in an action on a maritime contract. But the U.S. Court of Appeals for the Fifth Circuit, the federal courts' cutwater in matters maritime, recently confronted the problem. In Albany Insurance Co. v. Anh Thi Kieu, 927 F.2d 882 (5th Cir.), cert. denied, 502 U.S. 901, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991), the Fifth Circuit, after first determining that federal maritime law would not preempt state insurance statutes, was forced to choose between the law of Texas and Louisiana in an action on a policy of marine insurance.
 
 
 19
 The Fifth Circuit began its interstate choice of law analysis by reciting the three commonly stated choice of law principles applicable to marine insurance contracts: First, there is the rule requiring a federal admiralty court to apply the law of the state where the contract was formed. Second, there is the principle whereby the court applies the law of the state where the contract was issued and delivered. Third, there is the question of which state possesses the greatest interest in the resolution of the legal issues presented. Id. at 890 (citing, respectively, Graham v. Milky Way Barge, Inc., 811 F.2d 881, 885 (5th Cir.1987); Elevating Boats, Inc. v. Gulf Coast Marine, Inc., 766 F.2d 195, 198 (5th Cir.1985); Truehart v. Blandon, 884 F.2d 223, 226 (5th Cir.1989)).
 
 
 20
 As the Albany panel recognized, these separate rules might militate in favor of different results. The contract at issue in the present appeal was issued by Polaris in San Jose, Costa Rica, and delivered to Michael Banks in Long Beach, California. Banks executed the contract in California, and then forwarded it to Aqua-Marine in Portland, Oregon. The contract was thus "formed" and "issued" in Costa Rica, and "delivered" in California, for the benefit of an Oregon resident corporation. And because Aqua-Marine, a third-party beneficiary of the contract between Banks and Polaris, is a resident of Oregon, that State clearly has a significant interest in the resolution of the dispute.
 
 
 21
 The Albany court noted that "modern choice of law analysis, whether maritime or not, generally requires the application of the law of the state with the 'most significant relationship' to the substantive issue in question." 927 F.2d at 891 (citing Restatement (Second) of Conflict of Laws § 6 cmt. c (1980)). The "most significant relationship" test requires identification of the place of negotiation and execution of the contract as a means of determining which states have had sufficient contacts with the parties and the transaction to justify application of their law. Id. (citing Restatement (Second) of Conflict of Laws § 188 (1971)). The Fifth Circuit concluded that the choice of law rules regarding the places of formation, issuance and delivery "identify only the states which have sufficient contact with the policy and the parties that their laws can be applied." Albany Ins., 927 F.2d at 891. The "greatest interest" rule will determine, from among those states, which state's law should be applied. Id. In other words, "[a] federal court in a marine insurance dispute must apply the first two rules to isolate the 'eligible' states; of these states, the court then must determine which state has 'the greatest interest in the resolution of the issues.' " Id. (quoting Truehart, 884 F.2d at 226).
 
 
 22
 Employing the Albany two-step analysis, the only "eligible states" are California (where the performance bond was delivered and executed), and Costa Rica (where the bond was drawn up and issued). Under the first two rules, Oregon and Washington have had no contacts whatever with the performance bond: The Fifth Circuit's test eschews any inquiry into the place of performance or the location of the parties.
 
 
 23
 The Restatement, however, determines applicable law by identifying "the state which ... has the most significant relationship to the transaction and the parties...." Restatement (Second) of Conflict of Laws § 188(1) (1971). In making this determination, the Restatement counsels consideration of (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. Under the Restatement approach, the foregoing contacts are evaluated according to their relative importance with respect to the issue in question. Restatement § 188(2).[7] As between the Fifth Circuit and the Restatement, we think the Restatement's more comprehensive approach to the "most significant relationship" test will, in the long run, more appropriately serve the purposes of the choice of law rules, namely the furtherance of harmonious relations between states and the facilitation of commercial intercourse between them. Restatement § 6 cmt. d, § 188 cmt. b.
 
 
 24
 Using the Restatement approach, California, Oregon, Washington and Costa Rica all have had significant contacts with the performance bond: Polaris is a Costa Rica resident, and drew up and issued the bond in San Jose, Costa Rica. Banks is a California resident, and he executed the bond in California. Aqua-Marine, for whose benefit the bond was executed, is an Oregon resident. Polaris was, in case of default, to perform Banks' obligation to redeliver the vessel in Washington, by sailing the barge to its home port in Everett.
 
 
 25
 Of these three states, Oregon has a considerably greater interest in the application of its insurance code than do either California or Washington: Oregon has a strong interest in the protection of its citizens, including Aqua-Marine, against the insolvency of a foreign insurer. No citizen of Washington was a party to or beneficiary of the contract at issue. Likewise, California's interest in enforcing the obligations of Polaris (a Costa Rica corporation) which, under the terms of its bond, operate in favor of Aqua-Marine does not appear to be of any substance: California's citizen, Michael Banks, apparently elected not to defend himself against Aqua-Marine or Polaris, and the district court entered a default judgment against him on September 7, 1995. If Banks himself was not moved to assert his rights in this matter, California's interest in the resolution of the dispute must be correspondingly minimal. Finally, although Costa Rica might have a substantial interest in applying its own laws, its citizen, Polaris, has never argued that Costa Rica law should apply.
 
 
 26
 Oregon is, therefore, the state with the greatest interest in the resolution of this action to enforce a contract. Albany Ins., 927 F.2d at 891; Gulf Tampa Drydock Co. v. Great Atl. Ins. Co., 757 F.2d 1172, 1174 (11th Cir.1985); Barber v. Chatham, 939 F.Supp. 782, 786 (D.Haw.1996).
 
 
 27
 The district court's determination that Oregon's insurance statutes applied to Aqua-Marine's action against Polaris was therefore correct. All that remains is the question whether the district court interpreted those statutes correctly.
 
 C. The Oregon Insurance Code
 
 28
 Oregon's Insurance Code, Or.Rev.Stat. chs. 731-35, 737, 743-44, 746, 748, 850-51, applies to all persons who "transact insurance in this state or relative to a domestic risk...." Or.Rev.Stat. § 731.022. "Insurance" within the meaning of Oregon's insurance code includes a contract whereby one undertakes to pay either a specified or ascertainable sum of money to, or to confer a benefit upon, another, upon a determinable risk or contingency. Or.Rev.Stat. § 731.102(1). The performance bond in the present appeal in effect insured Plaintiff-Respondent Aqua-Marine against Michael Banks' failure to make proper redelivery of the subject oceangoing barge at Everett, Washington. Polaris did therefore make an insurance contract, thereby "transacting insurance." Or.Rev.Stat. § 731.146(1)(a).
 
 
 29
 The risk covered by the performance bond was the risk that Banks would fail to redeliver the barge to Aqua-Marine at the termination of the charter period. Redelivery was to be made at Everett, Washington, the barge's home port. In default of proper and timely redelivery by Banks, Polaris obligated itself to make that redelivery. In no sense was the risk a "domestic risk:" An insurer "transacts insurance relative to a domestic risk" only where the subject of the insurance resides, is located, or will be performed in Oregon. Or.Rev.Stat. § 731.086. Here, the only subject of the performance bond was the redelivery of the barge at Everett, Washington. The Aqua 242 resides in Washington, and was at no relevant time located in Oregon. The subject of the insurance does not reside in Oregon. It was not located in Oregon. It was not to be performed in Oregon. Unless Polaris "transacted insurance" in Oregon, Oregon's insurance code does not apply to the performance bond.
 
 
 30
 Polaris undeniably "made" an insurance contract. See Or.Rev.Stat. § 731.146(1)(a). The question remains, however, whether it did so in Oregon; Polaris drew its policy in Costa Rica, issued it in Costa Rica, and mailed it to Michael Banks in California, whereupon Banks executed the policy and forwarded it to Aqua-Marine. Polaris did not take or receive any application for insurance in Oregon, collect any premium in Oregon, advertise in Oregon, or employ any Oregon agent. See Or.Rev.Stat. § 731.146(1).
 
 
 31
 But the performance bond was executed entirely for the benefit of an Oregon resident corporation; by its terms Polaris expressly bound itself to Aqua-Marine. The fact that the subject barge is home-ported in Washington, rather than in Oregon, is not dispositive, nor is the fact that Polaris did not technically issue or deliver any policy in Oregon. By underwriting a marine risk in favor of an Oregon resident, Polaris did in fact transact insurance business "in Oregon." Any other determination would constitute a wholly unjustified and excessively formalistic reading of the statute which applies Oregon's insurance code to persons who "transact insurance in this state or relative to a domestic risk." Or.Rev.Stat. § 731.022.
 
 
 32
 Oregon's insurance code prohibits the transaction of insurance except as authorized by a certificate of authority issued to the insurer by the state's Director of Insurance. Or.Rev.Stat. § 731.354. Polaris admits it obtained no such certificate; Polaris was therefore an "unauthorized insurer" under Oregon's insurance code. Or.Rev.Stat. § 731.066(2). In Oregon, before an unauthorized insurer may file any pleading in an action against it, the defendant insurer must either (1) procure a certificate of authority or (2) deposit with the clerk of the court cash, securities, or a bond, sufficient to secure the payment of any judgment which may be entered against the insurer in the action. Or.Rev.Stat. § 746.340(1).
 
 
 33
 This requirement, however, does not apply in an action against an unauthorized insurer "arising out of any policy of ... wet marine and transportation insurance." Or.Rev.Stat. § 746.360(1). Polaris has argued, both in the lower court and in the present appeal, that the performance bond was a wet marine and transportation insurance policy as defined in Oregon's own insurance code.
 
 
 34
 Under Oregon's insurance statutes, "wet marine and transportation insurance" is a subset of general marine transportation insurance. Or.Rev.Stat. § 731.194. Therefore, it first must be determined whether the surety bond sued on herein can come within the statutory definition of general marine insurance.
 
 
 35
 Under the Oregon Insurance Code, "marine and transportation insurance" includes:
 
 
 36
 (1) Insurance against any and all kinds of loss of or damage to:
 
 
 37
 (a) Vessels, craft, aircraft, cars, automobiles and vehicles of every kind, as well as goods, freights, cargoes, merchandise, effects, disbursements, profits, moneys, bullion, precious stones, securities, choses in action, evidences of debt, valuable papers, bottomry and respondentia interests and all other kinds of property and interests therein, in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit or transportation, including war risks, on or under any seas or other waters, on land or in the air, or while being assembled, packed, crated, baled, compressed or similarly prepared for shipment or while awaiting the same or during any delays, storage, transshipment, or reshipment incident thereto, including marine builders' risks, and all personal property floater risks including bailees' customers risks;
 
 
 38
 (b) Person or to property in connection with or appertaining to a marine or inland marine, transit or transportation insurance, including liability for loss of or damage to either, arising out of or in connection with the construction, repair, operation, maintenance or use of the subject matter of such insurance (but not including life insurance or surety bonds nor insurance against loss by reason of bodily injury to the person arising out of the ownership, maintenance or use of automobiles);....
 
 
 39
 (2) Marine protection and indemnity insurance meaning insurance against, or against legal liability of the insured for, loss, damage or expense arising out of, or incident to, the ownership, operation chartering, maintenance, use, repair or construction of any vessel, craft or instrumentality in use in ocean or inland waterways, including liability of the insured for personal injury, illness or death or for loss of or damage to the property of another person.
 
 
 40
 Or.Rev.Stat. § 731.174.
 
 
 41
 Unless the bond constitutes a contract of "marine and transportation insurance" under Section 174, it cannot be deemed a "wet marine" insurance contract under Section 194.
 
 
 42
 Subsection 1(a) of the general "marine and transportation insurance" statute enumerates no fewer than twenty specific categories of things, insurance against loss of or damage to which is marine insurance. These are, generally, modes of conveyance (boats, cars, planes), goods and cargo, media of exchange (cash, bullion), gems, financial documents ("evidences of debt," securities), choses in action, and maritime hypothecations (respondentia and bottomry interests). The general term which follows the statutory enumeration of the foregoing categories of things is "all other kinds of property and interests therein."To conclude that the bond meets the definitions in Section 174(1)(a) would violate the principle ejusdem generis. Where general words follow the enumeration of specific classes of things, the general words must be construed as restricted to things of the same type as those specifically enumerated. State v. Brantley, 201 Or. 637, 271 P.2d 668, 672 (1954); Skinner v. Keeley, 47 Or.App. 751, 615 P.2d 382, 385 (1980); 2A Norman J. Singer, Sutherland Statutory Construction § 47.17, at 188-90 (5th rev. ed.1992). The rule derives from the recognition that "if the legislature had intended the general words to be used in their unrestricted sense they would have made no mention of the particular classes." Brantley, id.
 
 
 43
 The principle ejusdem generis requires the phrase "all other kinds of property and interests therein" to be interpreted to include only objects similar in nature to those objects enumerated by the preceding specific words. Id.; Sutherland, id. § 47.17. The subject of the surety bond at issue in the present appeal--timely redelivery of the barge at the conclusion of the charter period--is simply so unlike any of the things enumerated in subsection 1(a) that it cannot reasonably be said to be included in the catchall. In addition, surety bonds are explicitly excluded from the types of contracts defined as maritime insurance in subsection 1(b).
 
 
 44
 Subsection 2 of the statute includes, in its list of types of contracts declared to be marine and transportation insurance, "insurance against ... legal liability of the insured for ... expense arising out of, or incident to ... operation chartering ... of any vessel...." Or.Rev.Stat. § 731.174(2). The language of the surety bond itself precludes a finding that the bond purchased by Mike Banks from Polaris Insurance insured Banks against his liability for failure to redeliver the barge. The bond only guarantees performance of Banks' obligations under the charter party in the event of a default by Banks; it does not, in the event of such a default, absolve Banks of any liability under the charter party.[8] And the clause in the charter party requiring Banks to obtain the guarantee bond explicitly provided that "[t]his bond does not release Charterer from payment schedules as set forth elsewhere herein."
 
 
 45
 In sum, the surety bond is not "marine and transportation insurance" under any of the definitional subsections of Or.Rev.Stat. § 731.174. "Wet marine and transportation insurance" is a subset of "marine and transportation insurance." Or.Rev.Stat. § 731.194. Because the bond is not "marine and transportation insurance" within the meaning of Section 174, it cannot be "wet marine and transportation insurance" under Section 194. Aqua-Marine's civil action against Polaris Insurance on the bond is thus not one "arising out of any policy of ... wet marine and transportation insurance." Or.Rev.Stat. § 746.360(1). Polaris may not invoke Section 360's "wet marine" exemption from the litigation bond requirement contained in Or.Rev.Stat. § 746.340(1).
 
 Conclusion
 
 46
 We therefore hold (1) that the section of Oregon's insurance code requiring foreign insurers to post a litigation bond is not preempted by federal maritime law; (2) that the performance bond executed by Polaris and Banks in favor of Aqua-Marine is a maritime contract justifying the exercise of federal admiralty jurisdiction; (3) that therefore the choice of substantive law to be applied is governed by federal maritime choice of law rules; (4) that as between the States of California, Washington and Oregon, and the Republic of Costa Rica, Oregon is the state with the greatest interest in the outcome of this action, and so its insurance code applies; and (5) that the surety bond is not a contract of marine insurance, so that Polaris is obliged under Oregon law to post bond before appearing in an action against it arising out of an insurance contract relative to an Oregon risk. The district court properly ordered Polaris to post the litigation bond required by the state statute. The judgment of the district court is therefore AFFIRMED.
 
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 Article 19 of the charter party provided:
 CHARTERER shall furnish to OWNER a payment bond in the amount of one hundred thousand ($100,000.00) dollars. This bond is to provide OWNER with insurance that all payment and redelivery requirements of this CHARTER are met. This bond does not release the CHARTERER from payment schedules as set forth elsewhere herein.
 
 
 [2]
 The performance bond provided:
 The condition of this performance bond is for the redelivery of the subject chartered barge Aqua 242 to the Owner, and this bond is to guarantee to the Owner that such redelivery requirements are met. Failing which, the Surety will perform on the redelivery, up to the specified amount of this guarantee bond.
 Whether deliberately or inadvertently, the performance bond did not secure payment of the charter hire, as required by the charter party: The bond guaranteed only redelivery.
 
 
 [3]
 The true identity of "Latham Smith" remains a mystery, indeed, there is some doubt even as to his name. Polaris' correspondence suggests that the barge "Aqua 242" was surrendered to one "Lanthram Smith." Correspondence from Aqua-Marine's attorneys identifies the lienor on the barge as "Smith Maritime," and the captions to the orders entered in the district court name "Latham Smith, d/b/a Smith Maritime" as a defendant in Polaris' cross-complaint. In his affidavit filed in opposition to Aqua-Marine's motion for an order requiring Polaris to post the litigation bond, Miguel Golcher, Polaris' Managing Director, described Latham Smith as a towage operator with "a propensity to impose liens on vessels he towed and to embroil them in litigation and seize them in far off foreign ports...." Coincidentally, or perhaps not, there did exist, at least ninety years ago, a "Leatham & Smith Towing & Wrecking Co.," whose libel in admiralty is often cited as the source of the rule prohibiting the exercise of federal maritime jurisdiction over actions not wholly maritime in character. See Pacific Surety Co. v. Leatham & Smith Towing & Wrecking Co., 151 F. 440 (7th Cir.1907). Absent from the record in the present appeal is information sufficient to identify or describe him, or it, with any certainty
 
 
 [4]
 In Toomer, the defendant insurer had argued, surprisingly, that the Texas bond requirement statute was procedural, not substantive, and that federal admiralty courts could, under Wilburn Boat, apply only substantive state rules. The court, on the other hand, was convinced "that the statute here should properly be characterized as substantive," but eschewed the procedure/substance dialectic in favor of the Wilburn Boat preemption analysis. Toomer, 231 F.Supp. at 543
 
 
 [5]
 Haller v. Fox bears more than a passing resemblance to the present appeal. Haller, the shipowner, and Fox, the charterer, executed a bareboat charter of the steamboat "Mary F. Perley." The charter party required Fox to make monthly charter hire payments and to redeliver the vessel at the end of the charter term. Fox gave Haller a bond securing performance of his obligations under the charter party. Fox defaulted on the charter hire payments, incurred substantial expenses for services and supplies rendered to the vessel, and then absconded, leaving the ship in the hands of unnamed third parties. The shipowner sued the surety, and the court, citing De Lovio v. Boit, ruled that the action "is founded upon a contract relating directly to the employment, navigation, supplying, repairing, insurance, and possession of a ship," and that therefore the suit was properly brought in admiralty. 51 F. at 299
 
 
 [6]
 On the other hand, had Polaris promised, for example, (1) to pay a sum certain in the event of Banks' default on his charter hire payment obligations, and (2) to redeliver the barge should Banks fail to do so, the obligation to pay the sum certain would be non-maritime in character, Leatham & Smith, 151 F. at 443, and the bond would therefore be a "mixed" maritime and non-maritime contract. Ordinarily, a contract must be "wholly maritime" in nature to be cognizable in admiralty. Simon v. Intercontinental Transp. (ICT) B.V., 882 F.2d 1435, 1442 (9th Cir.1989). A claim on a "mixed" contract may be adjudicated in admiralty only if (1) the non-maritime obligations were "merely incidental" to the primarily maritime nature of the contract (in which case a federal admiralty court may hear both the maritime and non-maritime claims), or (2) the maritime claims could be severed from the non-maritime claims (in which case the federal admiralty court would hear only the severed maritime claims). Id. The wholly maritime character of the performance bond in the case sub judice obviates this "mixed" contract analysis
 
 
 [7]
 The Restatement provides
 In the absence of an effective choice of law by the parties ... the contacts to be taken into account ... to determine the law applicable to an issue include:
 (a) the place of contracting
 (b) the place of negotiation of the contract
 (c) the place of performance
 (d) the location of the subject matter of the contract, and
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 ....
 If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied
 Restatement (Second) of Conflict of Laws § 188(2) and (3).
 Polaris has argued that the choice of law provision in the charter party--selecting Washington as the state whose law would govern interpretation of the charter party--was incorporated by reference into the performance bond. This argument is far from convincing. The only provision in the charter party incorporated by reference into the performance bond was the date for final payment of charter hire: Paragraph 3 of the bond provides that "[a]ny suit under this bond must be instituted before the expiration from [sic] the date on which final payment under the contract falls due, Contract incorporate [sic] into this bond by reference." Nowhere else in either document is any provision of one incorporated into the other. Counsel for Polaris suggested at oral argument that the comma between the words "due" and "Contract" was a typographical error, and that the word "Contract" was intended to be the first word of an independent sentence incorporating the whole of the charter party into the performance bond. This argument is vitiated by the fact that the word "Contract" appears capitalized throughout the text of the bond. Even were it otherwise, the principle contra proferentem would require the ambiguity created by the alleged error to be resolved against Polaris, the drafter of the bond. The parties to the performance bond did not, therefore, make an effective choice of law with respect to the bond.
 
 
 [8]
 The operative paragraph of the bond provided as follows:
 NOW THEREFORE, the condition of this obligations is such that, if the Charterer shall faithfully perform the contract on its part and shall fully indemnify and save harmless the owner from all liability, cost, damage, expense, and attorney's fees which it may suffer by reason of the Charterer's failure to do so, and shall fully reimburse and repay the Owner for the outlay and expense which the Owner may incur in making good any such default, then this obligation shall by [sic] null and void, otherwise, to remain in full force and effect subject however to the conditions set forth herein.